## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

Martha J. McCampbell, by and through,                    Civil No. 18-1543 (DWF/TNL)
her guardian and conservator, Julie A. Hidani,

                    Plaintiff,

v.                                                       **MEMORANDUM**
                                                         **OPINION AND ORDER**

David C. McCampbell, and Laura O.
McCampbell, jointly and severally

                    Defendants,
                    Counterclaimants, and
                    Third-Party Plaintiffs.

v.

Mary E. Neveaux, Richard E. McCampbell,
Sheila L. Meagher, & Julie A. Hidani,

                    Third-Party Defendants.

---

Francis J. Rondoni, Esq., and Margaret Mary Grathwol, Esq., Chestnut Cambronne, PA, counsel for Plaintiff and Third-Party Defendants.

Karin Ciano, Esq., Karin Ciano Law PLLC; and Kirstin E. Helmers, Esq., and Rodney J. Mason, Esq., Rodney J. Mason Ltd, counsel for Defendants, Counterclaimants, and Third-Party Plaintiffs.

---

## INTRODUCTION

This matter is before the Court on Defendant David C. McCampbell ("David")

and Laura O. McCampbells's ("Laura") (collectively, "Defendants") Motion for

Summary Judgment.[1]  (Doc. No. 52 ("Motion").)  Plaintiff Martha J. McCampbell

("Martha" or "Plaintiff"), by and through her guardian and conservator, Julie A. Hidani

("Julie") opposes the Motion.  (Doc. No. 58 ("Pl. Opp.").)  For the reasons set forth

below, the Court grants Defendants' Motion to the extent that it dismisses Counts I and II

as they pertain to Martha's Social Security Income and denies Defendants' Motion in all

other respects.

## BACKGROUND

The factual background for the above-entitled matter is clearly and precisely set

forth in the Court's October 12, 2018 Memorandum Opinion and Order and is

incorporated by reference herein.[2]  (*See* Doc. No. 26 ("October 2018 Order").)  In short,

this action largely relates to a trust created in 2013 by Jean E. McCampbell ("Jean").

(Doc. No. 1 ("Compl.") ¶ 13; *see also* Doc. No. 55 ("Ciano Decl.") ¶ 3, Ex. 1 ("Jean E.

McCampbell Trust Agreement" or "Trust").)  Jean was Martha, David, and Julie's

mother.[3]

Martha is approximately sixty years old and suffers from medical and mental

health conditions that inhibit her ability to care for herself.  (Compl. ¶ 2.)  Julie has been

Martha's limited guardian and conservator of her estate since March 14, 2018.  (*Id.* ¶ 6.)

---

[1]      David and Laura are married.  (Doc. No. 1 ("Compl.") ¶ 7.)

[2]      The Court supplements the facts as necessary.

[3]      Jean has three other surviving children:  Richard E. McCampbell, Jr. ("Richard Jr."), Mary E. Neveaux ("Mary"), and Sheila Meagher ("Sheila").  (Compl. ¶ 10.)

Martha brings this suit by and through Julie, alleging civil theft ("Count I"), conversion ("Count II"), unjust enrichment ("Count III"), financial exploitation of a vulnerable adult ("Count IV"), and breach of fiduciary duty ("Count V") by excluding Martha from trust assets and Social Security income to which she was allegedly entitled to.  (*Id.* at 1, ¶¶ 37-67.)

In early 2013, David and Laura moved from Wisconsin to Minnesota to care for David's aging parents, Richard and Jean, and Martha.[4]  (Ciano Decl. ¶ 8; Ex. 6 ("Sheila Dep.") at 291; Doc. No. 63 ("Laura Decl.") ¶ 5.)  On several occasions prior to moving, David's parents told him—and he understood—that he could have their home in exchange for providing care.[5]  (David Dep. at 80, 87.)  David's ultimate decision to move was partly based on concern over his parents' finances when Jean told him that she had accrued $21,000 in credit card debt that she could not account for.  (*Id.* at 80.) Defendants assert that all siblings recognized that unless David and Laura moved in with Jean, Richard, and Martha to provide care, "there was no other option that could avoid the sale of Jean and Richard's home and the institutionalization of Richard, Jean, and Martha."  (Def. Memo. at 4 (citing Ciano Decl. ¶ 9, Ex. 7 ("Julie Dep.") at 52-69); *see also* Laura Decl. ¶ 5.)  Therefore, Defendants assert that despite leaving their jobs and

---

[4]     David is a career registered nurse with experience treating geriatric and psychiatric patients, as well as in arranging for them to be admitted to care facilities.  (Sheila Dep. at 80; Ciano Decl. ¶10; Ex. 8 ("David Dep.") at 19.)

[5]     During his deposition, David testified to his understanding he had to "care for mom and Martha" in exchange for his parents' house.  (David Dep. at 87.)

family in Eau Claire, Wisconsin, they moved to Minnesota to provide the necessary care. (Def. Memo. at 4 (citing David Dep. at 15, 67-68, 74, 117).)

In addition to nursing care and home maintenance which often consisted of 17-hour workdays, David obtained power of attorney and assumed responsibility for writing all checks and paying all bills and taxes.[6]  (David Dep. at 70, 74-76, 90-91; Laura Decl. ¶ 8.)  David also became the representative payee of Martha's Social Security Income. (Ciano Decl. ¶ 5, Ex. 3a ("Soc. Sec. Accountings").)  Jean paid Defendants $4,300 a month in exchange for care.[7]  (*Id*. at 39.)  Jean also paid for Defendants' food and living expenses.[8]  (*Id.* at 70, 157.)  Martha paid $600-700 a month to cover her room and board.[9]  (David Dep. at 215-217.)

In February 2013, Jean met with an estate planning attorney, William Hansen ("Hansen") to discuss updating her estate planning to meet her and Richard's long-term

---

[6]     Laura was responsible for balancing Jean's accounts because she had over 20 years of banking experience.  (David Dep. at 74.)

[7]     When Richard died in April 2013, Jean reduced the payment for care to $3,300 a month.  (David Dep. at 39.)

[8]     Defendants paid for their own health insurance, car insurance, and car payment. (David Dep. at 79; Laura Decl. ¶ 7.)

[9]     Martha received approximately $800 each month in Social Security Income. (David Dep. at 132; *see also* Soc. Sec. Accountings.)  After her living expenses, she used the remainder as spending money.  (*Id.* at 215-217.)  David accounted to the Social Security Administration annually for his use of Martha's benefits.  (Soc. Sec. Accountings.)  Defendants assert that their expert reviewed his records and identified no transactions suggesting a misuse of Martha's Social Security Income.  (Def. Memo. at 20 (citing Ciano Decl. ¶ 6, Ex. 4 ("Expert Report")).)

care needs.[10]  (Julie Dep. at 42-43.)  The estate planning took several months, involved

Jean's children, and included multiple drafts of a new trust.[11]  (Ciano Decl. ¶ 7, Ex. 5

("Hansen Dep.") at 121-122; Julie Dep. at 13, 28, 78.)

On August 13, 2013, Hansen forwarded a final draft of the trust to Jean, David,

Julie, and Richard Jr.  (Hansen Dep. at 137-138, 181.)  In an accompanying cover letter,

Hansen explained Jean's intent to leave her home to David and Laura and that a

Supplemental Needs Trust for Martha would come into existence only if David, Laura,

Julie, and Richard Jr. all died before Jean.  (Ciano Decl. ¶ 4, Ex. 2 ("Hansen Letter").)

Jean ultimately executed the final draft as the Jean E. McCampbell Trust Agreement on

August 26, 2013.  (Trust).)[12]

The Trust names Jean and David as trustees during Jean's lifetime, and David as

sole trustee upon Jean's death.  (Trust at 1.)  The Trust also names David and Laura as

primary beneficiaries of its assets, including Jean's principal residence located in Golden

---

[10]     Jean and Richard had previously established a trust ("McCampbell Family Trust") to provide for Martha's "reasonable living expenses and other needs when benefits from publicly funded benefit program are not sufficient to provide adequately for those needs," however, it did not address their own long-term care needs.  (Doc. No. 59 ("Rondoni Decl. ¶ 5, Ex. D ("McCampbell Family Trust") ¶ 3.5.1.)

[11]     One version of the trust gave Jean's home to Defendants upon Jean's death. (Hansen Dep. at 74.)  A second version put Jean's home in a supplemental needs trust for Martha.  (*Id.* at 75.)  A third version created a "house trust" that imposed conditions on David to inherit Jean's home.  (*Id.* at 75-76.)  Defendants alleged that Jean initially selected the third version but subsequently changed her mind and executed a trust similar to the first version.  (Def. Memo. at 10-11 (citing Hansen Dep. at 76; 117, 120-121.)

[12]     On the same day, Jean also executed a pour-over will devising the residue of her estate to the Trust.  (Rondoni Decl. ¶ 2, Ex. A.)

Valley, Minnesota 55426 ("Home"), and states Jean's understanding that David and

Laura intended to provide care for her and Martha.  (*Id.* ¶ 2.3.4.)  Specifically, the Trust

states:

> The Trustees shall distribute all the trust assets not effectively distributed
> by the preceding provisions of this agreement, including but not limited to,
> my principal residence which is commonly known as 705 Hanley Road,
> Golden Valley, Minnesota 55426, and legally described as "Lot 5, Block 1,
> Hope Chest Addition, Hennepin County, Minnesota," ("Homestead"),
> subject to any mortgage, to my son, DAVID C. MCCAMPBELL, and my
> daughter-in-law, LAURA O. MCCAMPBELL, as joint tenants, or entirely
> to the survivor of them.  It is my understanding that DAVID C.
> MCCAMPBELL and LAURA O. MCCAMPBELL intend to continue to
> provide care for me and my daughter, MARTHA J. MCCAMPBELL, until
> our respective deaths and therefore, I name DAVID C. MCCAMPBELL
> and LAURA O. MCCAMPBELL, or entirely to the survivor of them, as the
> primary beneficiaries of remaining trust assets.

(*Id.*)  The Trust further provides:

> If both DAVID C. MCCAMPBELL and LAURA O. MCCAMPBELL do
> not survive me, then the remaining trust assets will be distributed to my
> daughter, JULIE A. HIDANI, if she survives me, or if JULIE A. HIDANI
> does not survive me, to my son, RICHARD E. MCCAMPBELL JR., if he
> survives me, or if RICHARD E. MCCAMPBELL, JR. does not survive me,
> to my children named below who survive me . . . MARY E. NEVEAUX,
> my daughter; MARTHA .J. MCCAMPBELL, my daughter; and SHEILA
> L. MEAGHER, my daughter.

(*Id.* ¶¶ 2.3.4-2.3.4.3.)  The Trust stipulates that if Martha is under the age of 65, any share

she is entitled to should be distributed to a Supplemental Needs Trust:

> Notwithstanding anything to the contrary, the share for my daughter,
> MARTHA J. MCCAMPBELL, if she survives me, and if she is under the
> age of sixty-five (65), shall instead be distributed to the Trustee of the
> Martha J. McCampbell Supplemental Needs Trust to be administered and
> distributed as provided in Article Three herein.  If MARTHA J.
> MCCAMPBELL is sixty-five (65) or older, then her share shall instead be
> distributed outright to her.

(*Id.* ¶ 2.3.4.)  The parties dispute Jean's intent with respect to:  (1) whether the distribution of Home to David and Laura was contingent on them providing life-long care for her and Martha; and (2) Martha's share of the Trust's property and proceeds.[13]  (*See* Def. Memo. at 23-28; Pl. Opp. at 29-35.)

On February 6, 2014[14], Sheila wrote a letter to Jean that expressed her concerns about the Trust and asked her to amend or rewrite it so that it would "thoroughly protect" Martha.[15]  (Ciano Decl. ¶ 17, Ex. 15 ("Concerns") at 3; Sheila Dep. at 125-126.)  Sheila shared her Concerns with her siblings with Julie and Rich.  (Concerns at 2.)  Defendants assert that on August 20, 2014, Julie and Sheila contacted Hansen in attempt to get Jean to modify her will and trust.  (Def. Memo. at 15 (citing Sheila Dep. at 148; Julie Dep. at

---

[13]     With respect to Sheila, the Trust states that "the share for my daughter, SHEILA L. MEAGHER, shall be subject to the conditions provided in paragraph 2.3.3 herein."  (Trust ¶ 2.3.4.).)  Those conditions provide:

> During my lifetime, I made a loan to my daughter, SHEILA L. MEAGHER, in the amount of Forty Thousand and no/100 ($40,000) Dollars.  As of the date of this document, my daughter has not made any payments towards the outstanding loan balance.  The loan balance shall be considered an asset of this trust and the Trustees have the discretion whether or not to expend other trust assets to collect the outstanding loan balance from my daughter.  The Trustees shall not distribute any share of the remaining Trust assets to SHEILA L. MEAGHER or to her descendants, until the outstanding balance of the loan has been paid in full.

(*Id.* ¶ 2.3.3.)

[14]     The letter is dated February 8, 2013; however, Sheila stated that she did not send it until February 6, 2014.  (*See* Sheila Dep. at 125-126.)

[15]     During her deposition, Sheila also expressed concern that her own debt was reflected in the Trust.  (Sheila Dep. at 90.)

143-144; Ciano Decl. ¶ 7, Ex. 5 ("Hansen Dep.") 138-141.)  Notwithstanding, the record

does not reflect that Jean ever changed the Trust.

David and Laura lived in the Home with Jean and Martha until December

2014.  (David Dep. at 116.)  Jean, Laura, and David then signed a mortgage to

purchase a "newer, quieter, handicapped-accessible home in Menomonie,

Wisconsin."[16]  (Def. Memo. at 16 (citing David Dep. at 156).)  The new property

was titled in the names of David, Laura, and Jean as joint tenants.[17]  (Laura Decl.,

Ex. 2 ("Mortgage and Title"); *see also* David Dep. at 141, 145)  The Home was

sold on March 20, 2015 for $258,500.  (*Id.* at 152-153; Compl. ¶¶ 24-25.)

Plaintiff asserts that after paying off an equity line of credit on Home for $39,700

and paying for repair of the Home's sewer, approximately $221,000 remained as

---

[16]     David used his capacity as Jean's Power of Attorney to pay $23,491 for a down
payment on the new property.  (David Dep. at 142, 155-156).)  David took out a loan in
the amount of $198,000 for the remainder of the purchase price.  (Mortgage and Title.)
Plaintiff asserts that David used Jean's pension as identifiable purchasing income.  (Pl.
Opp. at 13 (citing David Dep. at 144).)
        Defendants allege that Jean approved the transaction and assert that the credit
union required David and Laura to sign the mortgage as borrowers and to assume
responsibility for repaying it in the event of Jean's death because Jean was 88 years old at
the time.  (Doc. No. 62 ("Reply") at 4 (citing Laura Decl. ¶ 11).)

[17]     Defendants contend that they did not ask the company to include their names on
the title of the Menomonie home, but the company did so on its own initiative.  (David
Dep. at 145, 202; Reply at 4 (citing Laura Decl. ¶ 12).)  Moreover, Defendants contend
that while the company initially left Jean's name off the title, it added her name as soon
as Defendants asked them to.  (Reply at 4 (citing Laura Decl. ¶ 13).)
        Moreover, Defendants contend that after they moved, David consulted with
Hansen to inquire whether he needed to have the new home re-titled in Jean's trust, and
that Hansen concluded that it was not necessary because the operation of Jean's estate
planning would produce the same outcome.  (Def. Memo. at 17 (citing Hansen Dep. at
150-151, 185); *see also* Laura Decl. ¶ 18.)

proceeds from the sale.  (Pl. Opp. at 13 n.5 (citing David Dep. at 62, 160; Hansen

Dep. at 62).)  Approximately $210,390 of the proceeds was used to pay off the

mortgage of the new property in Menomonie.[18]  (David Dep. at 141.)

Jean suffered a stroke on December 2016 and subsequently moved into a skilled

nursing facility.  (David Dep. at 159.)  Jean continued to pay David and Laura for care

until February 2017 when it became clear that she would be unable to return from the

nursing facility.  (*Id.* at 160.)  Additionally, Jean paid for household expenses and

homeowner's insurance until approximately August 2017.  (*Id.* at 162, 164.)  Medicare

paid for the cost of Jean's nursing care until March 2017, after which she used her own

assets.[19]  (*Id.* at 161.)  Jean died in August or September 2017.[20]

Sometime after Jean's death, Mary, Julie, and Sheila wrote to David and Laura

asserting that "all McCampbell siblings grew up knowing both from Mom and Dad's

spoken word and [the McCampbell Family Trust], that all they had would be given to

---

[18]    Plaintiff asserts that Defendants cannot account for the approximately $20,000
remaining from the proceeds of the sale of Home.  (Pl. Opp. at 14.)
        Defendants assert that after closing costs, paying for a new sewer and well-
capping at Home, paying the balance of Jean's home equity loan on Home, and paying
off the mortgage on the new property, there were no remaining proceeds from Home.
(Reply at 3 n.3 (citing Laura Decl. ¶¶ 16-17).)

[19]    When her assets ran out, Defendants cashed out Jean's life insurance policy to pay
for her care.  (David Dep. at 175-176.)

[20]    Defendants assert that Jean died on September 16, 2017.  (Def. Memo. at 19; *see
also* Laura Decl. ¶ 21.)  Plaintiff asserts that she died in August 2017.  (Pl. Opp. at 17.)

Martha."[21]  (Rondoni Decl. ¶ 9, Ex. H ("Letter") at 2.)  While thanking David and Laura

for their services, the Letter asserted that David and Laura had been generously

compensated and expressed concern about them inheriting the balance of "Mom/Martha's

estate" unless they continued to care for Martha for the remainder of her life.  (*Id.* at 3.)

To this end, the Letter requested several modifications to the Trust including:  (1) naming

Martha as the sole beneficiary; (2) stipulating a standard of care and protecting Martha

from being institutionalized; (3) establishing contingency plans in the event that David

and Laura were unable or unwilling to care for Martha; and (4) requiring that the

caregiver provide annual accounting detailing remaining Trust income and expense.  (*Id.*

at 3-4.)

      The Letter also requested that Defendants provide:  (1) an accounting or financial

statement for 2013-2016 that detailed all income, outflows, and assets; (2) copies of

Jean's bank statement and annual tax returns for 2013-2016; and (3) an accounting for the

proceeds of Richard's life insurance policy "tracking it to an asset of the Trust".  (*Id.*

at 4.)  Finally, the Letter requested that all assets be "immediately moved" into the Trust.

(*Id.*)

      In August 2017, Martha moved back to Minnesota to live with Julie.  (Julie Dep.

at 200.)  Martha lived with Julie until January 2018 when she moved to an assisted living

---

[21]      The parties dispute when the Letter was written.  Plaintiff asserts that it was
written in 2013.  (Pl. Opp. at 12.)  Defendants assert that it was written in 2017 after Julie
and Sheila consulted with attorneys.  (Reply at 6 n.8 (citing Sheila Dep. at 186-188; Julie
Dep. at 6.)  While the Court cites the Letter to convey its authors' displeasure with the
Trust, the date it was written and the specific requests it makes has no impact on the
Court's analysis.

facility.  (*Id.* at 15-16.)  Julie also became the representative payee for Martha's Social

Security Income.  (*Id.* at 192; Ciano Decl. ¶ 5, Ex. 3b.)  Julie is approximately $10 short

each month to pay Martha's rent at the assisted living facility and is not able to save any

income for her future needs because the amount of benefits Martha receives is not enough

to meet her livings expenses.  (Julie Dep. at 96, 143, 193).)

Sometime after Jean died, David and Laura sold the property in Menomonie and

used the proceeds to purchase a less expensive home in Eau Claire, Wisconsin.[22]  (David

Dep. at 148.)

Martha, by and through, Julie, alleges that the proceeds from the sale of the Home

should have been allocated and distributed to her Supplemental Needs Trust, as required

by the Trust.  (Pl. Opp. at 27-28; *see also* Compl. ¶ 29.)  She also alleges that during the

four years she lived with David and Laura, they wrongfully took and kept her Social

Security Income.  (*See id.* ¶ 22.)

David and Julie bring four counterclaims pursuant to the Minnesota Trust Code,

Minn. Stat. §§ 501C.0202 *et. seq*, against Martha and the same claims against Julie,

Richard, Mary, and Sheila in a Third-Party Complaint.  (Doc. No. 28 ("Trust Code

Claims") ¶¶ 130-146.)  Specifically, David and Laura seek:  (1) confirmation of David's

actions as trustee; (2) determination of the persons having an interest in the Trust and the

---

[22]     Approximately $20,000-30,000 remained after closing on the Eau Claire home.
(David Dep. at 153-154.) Plaintiffs contend that they used the balance of proceeds for
closing costs and necessary repairs to the Eau Claire property.  (Laura Decl. ¶¶ 22-23.)

nature and extent of their interests; (3) recovery of funds owed to the Trust; and

(4) acceptance of the trustee's resignation and termination of the Trust.  (*Id.*)

David and Laura now move for summary judgment on their Trust Code claims,

and on the claims alleged in Martha's Complaint.

## DISCUSSION

## I.     Summary Judgment Standard

Summary judgment is appropriate if the "movant shows that there is no genuine

dispute as to any material fact and the movant is entitled to judgment as a matter of law."

Fed. R. Civ. P. 56(a).  Courts must view the evidence and all reasonable inferences in the

light most favorable to the nonmoving party.  *Weitz Co., LLC v. Lloyd's of London*, 574

F.3d 885, 892 (8th Cir. 2009).  However, "[s]ummary judgment procedure is properly

regarded not as a disfavored procedural shortcut, but rather as an integral part of the

Federal Rules as a whole, which are designed 'to secure the just, speedy, and inexpensive

determination of every action.'"  *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986)

(quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank v. Magna*

*Bank of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  The nonmoving party must demonstrate

the existence of specific facts in the record that create a genuine issue for trial.  *Krenik v.*

*Cty. of Le Sueur*, 47 F.3d 953, 957 (8th Cir. 1995).  A party opposing a properly

supported motion for summary judgment "may not rest upon mere allegation or denials

of his pleading but must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

## II.   Construction of a Written Instrument

To determine whether summary judgment is appropriate, the Court must construe the Trust.  The Court's purpose in construing a trust agreement is "to ascertain and give effect to the grantor's intent" as "gather[ed] from the instrument as a whole, not isolated words." *In re Pamela Andreas Stisser Grantor Trust*, 818 N.W.2d 495, 501 (Minn. 2012) (internal quotation marks and citation omitted).

"A settlor's 'intention must be ascertained from the language of his will, which may have a meaning controlled by surrounding circumstances or context.'" *In re Trust Created under Agreement with Lane*, 660 N.W.2d 421, 425 (Minn. App. 2003) (quoting *In re Holden's Trust,* 291 N.W. 104, 106 (Minn. 1940).)  Where the trust agreement is unambiguous, a court ascertains the grantor's intent from the language of the agreement, without resort to extrinsic evidence.  *Stisser*, 818 N.W.2d at 501 (citing *Matter of Trust Created Under Agreement with McLaughlin*, 361 N.W.2d 43, 44 (Minn. 1985)).  "Absent ambiguities, extrinsic evidence may not be admitted to vary the plain meaning of the testator's words." *In Matter of Campbell's Trusts*, 268, N.W.2d 856, 864 (Minn. 1977).

Trust provisions may be found ambiguous if they are reasonably susceptible to two or more interpretations.  *See In re Estate of Zagar*, 491 N.W.2d 915, 916 (Minn. App. 1992).  When there is ambiguity concerning the settlor's intent, the Court may consider extrinsic evidence.  *Campbell's Trusts,* 258 N.W.2d at 864.  "A court may not rewrite a trust or will to provide by conjecture what a [settlor] might have intended if he

knew how events would occur."  *Matter of Wiedemann,* 358 N.W.2d 139, 142

(Minn.App.1984)

## III.   The Trust

The core of the parties' dispute rests on whether the Trust imposed conditions on

David and Laura to inherit Jean's Home and proceeds.  Plaintiff contends that the Trust

required David and Laura to care for Jean and Martha for the rest of their lives in order to

inherit the Home.[23]  (Pl. Opp. at 29-35.)  Plaintiff argues further that if David and Laura

did not fulfill this requirement, they had to "give the [Home] and Trust assets back."  (*Id.*

at 45-46.)  Plaintiff asserts that "because Defendants stopped caring for Martha within

months of Jean's death, they have no right to the [Home]—or the proceeds of its sale

under the Trust."  (*Id.* at 46.)

Defendants argue that Jean intended to give her property outright to David and

Laura with no requirement that they provide lifetime care for her or Martha.[24]  (Def.

---

[23]     Plaintiff also contends that the Trust required Jean's death as a condition precedent to Defendants' right to the Trust property or proceeds.  (Pl. Opp. at 27.)  Accordingly, Plaintiff argues that the proceeds of the Home should have been put in the Trust, and at the very least, the Menomonie house should have been put in the name of Trust so that when it was sold, the Trust would receive the proceeds to be used to care for Martha.  (*Id.* at 27-28.)  The Court need not address this argument because it denies Defendants' Motion on other grounds.  Notwithstanding, the Court observes that the record clearly reflects disparate positions with respect to how and why the Home was sold and the Menomonie property was titled.  Moreover, the issue is interwoven with Jean's intent.

[24]     Defendants also assert that "Plaintiff ignores the indisputable fact that David and Laura *did* care for Jean and Martha for years, keeping both at home for as long as possible."  (Reply at 4 (emphasis in original).)  Additionally, Defendants claim that while not legally required to, they were prepared to continue caring for Martha for the rest of her life.  (*Id.* at 5.)

Memo. at 23-28.)  Moreover, Defendants assert that the Trust contained no provision for

giving assets back, and that its plain language made clear that any supplemental needs

trust for Martha was contingent on David, Laura, Julie, and Richard Jr. all pre-deceasing

Jean—an event that did not and will not ever occur.  (*Id.*)  Accordingly, Defendants argue

that Martha has no claim to the Trust property, and that they are entitled to summary

judgment on both their Trust Code Claims and Martha's Complaint.  (*Id.* at 38-39.)

While each party contends that the Trust unambiguously supports its position, the

Court finds the Trust's language unclear and therefore must rely on extrinsic evidence to

determine Jean's intent.  *Campbell's Trusts,* 258 N.W.2d at 864.  Specifically, the Court

cannot conclude as a matter of law that Jean intended to distribute the Trust's property or

proceeds outright to David and Laura when after naming them as beneficiaries, the Trust

states that "[i]t is my understanding that [David and Laura] intend to continue to provide

care for me and my daughter [Martha], until our respective deaths and therefore, I name

[David and Laura] as the primary beneficiaries of remaining trust assets."  (Trust ¶ 2.3.4.)

Notwithstanding, based on the placement of the statement and the fact that the Trust

contains no provision about whether or how to return any Trust property or proceeds if

David and Laura did not provide lifetime care to Jean or Martha, the Court cannot

conclude that the statement was a required condition as opposed to an explanation for her

decision.  Accordingly, the Court finds the Trust ambiguous and cannot conclude from its

plain language that Jean intended that David and Laura's right to the Trust property or

proceeds was conditioned on them providing lifelong care to her and Martha.

Even relying on extrinsic evidence, though, the Court finds that it cannot conclude as a matter of law what Jean intended when she crafted her trust.  Indeed, each party contends that the extrinsic evidence conclusively supports its respective position. Defendants cite the protracted discussions with Hansen, the multiple drafts of the Trust, and the Hansen Letter to argue that the extrinsic evidence conclusively shows that from the time the Trust was executed on August 26, 2013, Jean intended to give her house to David and Laura upon her death without any condition other than that they survive her. (Def. Memo. at 27.)  Moreover, Defendants cite Sheila's Concerns and Julie and Sheila's displeasure with the Trust to argue that Jean's children clearly understood her intent not to leave Home to Martha.  (*Id.* at 28.)

Notwithstanding, Plaintiff cites surrounding circumstances including Jean and Richard's ongoing expressed intent to leave their estate to Martha, and David's understanding that his right to Home was based on providing care to Jean and Martha. (Pl. Opp. at 32-35.)  While the Court cannot speculate what Jean would have wanted if she had known that David and Laura would not ultimately care for Martha for the rest of her life, the Court cannot ignore evidence that Jean consistently advocated for Martha's lifelong care and modeled that care throughout her own life.  Taking the evidence and construing all reasonable inferences in the light most favorable to Plaintiff, as it must, the Court finds that there are disputes over genuine issues of material fact that preclude summary judgment.

In short, the Court finds that the surrounding circumstances, combined with the ambiguous language in the Trust, leave it unable to conclude as a matter of law what Jean

intended when she crafted the Trust.  While Defendants cite persuasive evidence that Jean changed her mind with respect to requiring lifelong care for her and Martha as a condition of inheriting her estate, the Court cannot ignore Jean's ongoing expressed intent and supporting actions that Martha receive lifelong care.  Notwithstanding, the Court observes that prevailing at the summary judgment stage is not tantamount to prevailing at trial.  Indeed, while the Court cannot conclusively determine Jean's intent as a matter law based on the plain language of the Trust or on extrinsic evidence, Plaintiff faces a much higher standard to prevail at trial.

Because Defendants' Trust Count Claims and the bulk of the claims Martha alleges in her Complaint hinge on resolution of Jean's intent with respect to Martha's interest in any Trust property or proceeds, the Court finds that issues of material fact largely preclude summary judgment with respect to them as well.

Notwithstanding, the Court finds that no reasonable factfinder could find that Defendants misused or wrongfully interfered with Martha's Social Security Income. Accordingly, the Court grants Defendants' Motion with respect to Martha's Social Security Disability Income on Counts I and II of her Complaint.[25]

With respect to Count I, Defendants correctly assert that the Social Security Administration regulates the use of such benefits and provides administrative remedies for those concerned about a representative payee's misuse of funds.  (Def. Memo. at 31.)

---

[25]     Plaintiff's opposition to Defendants' Motion does not address Counts I and II with respect to Martha's Social Security Income.  (*See generally* Pl. Opp.)  Accordingly, those claims are waived.  *Ames v. Nationwide Mut. Ins. Co.*, 760 F.3d 763, 770-71 (8th Cir. 2014).  Notwithstanding, the Court addresses and affirms Defendants' arguments.

Here, the record does not reflect that Plaintiff pursued administrative remedies. Moreover, there is no evidence to suggest that Defendants used Martha's benefits for anything other than the permissible use of reasonable living expenses.  (*See* Soc. Sec. Accountings; *see also* Expert Report.)

Similarly, Count II also fails with respect to Martha's Social Security Income because Martha cannot show that Defendants unlawfully received and used her benefits for anything other than Martha's "current maintenance."  *In re Guardianship of Nelson*, 547 N.W.2d 105, 107 (Minn. App. 1996) ("The Social Security Administration considers payments to 'have been used for the use and benefit of the beneficiary if they are used for the beneficiary's current maintenance,' which includes [ ] costs of food, shelter, clothing, medical care, and personal comfort items."  *In re Guardianship of Nelson*, 547 N.W.2d 105, 107 (Minn. Ct. App. 1996) (quoting 20 C.F.R. § 4042040).

## CONCLUSION

The Court finds that the Trust language is ambiguous.  Moreover, the Court cannot conclude Jean's intent as a matter of law from either extrinsic evidence or surrounding circumstances.  Accordingly, the Court finds that disputes over genuine issues of material fact preclude summary judgment with respect to Defendants' Trust Code Claims and all but Counts I and II as they pertain to Martha's Social Security Income.  The Court notes again, though, that while the bulk of Plaintiff's claims survive, Plaintiff faces a much higher standard to prevail at trial.  Moreover, the Court reemphasizes its belief that continued litigation is unlikely to benefit either party and strongly encourages the parties

to settle this case.[26]  The Court urges the parties to work together to find common ground and to act according to their moral convictions as opposed to any other motivating factor.

### ORDER

Based upon the foregoing, **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Doc. No. [52]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

1.      Defendants' Motion is **GRANTED** with respect to Counts I and II of Plaintiff's Complaint (Doc. No. [1]) insofar as Counts I and Counts II pertain to Martha J. McCampbell's Social Security Income.

2.      Defendants' Motion is **DENIED** in all other respects.

Dated: May 8, 2020                              s/Donovan W. Frank
                                                DONOVAN W. FRANK
                                                United States District Judge

---

[26]     The Court strongly encouraged the parties to settle in its October 2018 Order; however, all attempts were unsuccessful.  If the parties would like the Court's assistance in pursuing a settlement, they may contact chambers and the Court will help coordinate priority scheduling of a settlement conference with the Magistrate Judge.